IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 8, 2017

**STATE OF TENNESSEE v. ALONZO CHRISTOPHER DOWNEY**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-A-678      Mark J. Fishburn, Judge**

_____

**No. M2017-00304-CCA-R3-CD**

_____

A Davidson County trial judge convicted the Defendant, Alonzo Christopher Downey, of domestic assault sentenced him to serve eleven months and twenty-nine days of probation. On appeal, the Defendant contends that the evidence is insufficient to support his conviction. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Dwight Scott, Nashville, Tennessee, for the appellant, Alonzo Christopher Downey.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Lody Rosario Limbird, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from allegations that the Defendant assaulted the victim, Elishia Cheathem, on August 15, 2014, in her home. With regard to these allegations, a Davidson County grand jury indicted the Defendant for domestic assault. The Defendant waived his right to a jury trial, and a bench trial ensued, during which the parties presented the following evidence: The victim testified that she had been dating and living with the Defendant at the time of these events. She testified that on the morning of August 15, 2014, she had just finished the night shift at her workplace. She testified that the Defendant was scheduled to pick her up from work at 7:00 a.m. but was close to an hour late. Once the Defendant picked up the victim and took her to their shared home, he took the victim's eldest son to school while the victim's younger son remained in the

home with her. Upon the Defendant's return to the home, the victim and the Defendant began arguing about why the Defendant was late to pick her up and where he had been. The Defendant told the victim that he was at a friend's house before picking up the victim from work and that he was late because he had fallen asleep.

After the verbal argument, the victim hid the Defendant's phone in her son's bedroom. The victim then walked back to the living room and sat down on the couch. The victim said that she hid the phone because she "felt like he was cheating and [she] wanted to know what was going on." The victim stated that she planned to monitor the phone "to see if somebody would call," so she would know with whom the Defendant had been spending time. After the victim hid the phone and before the Defendant left for work, the Defendant began getting angry and repeatedly told the victim to go get his phone. The victim replied that she did not know the location of the phone. The victim testified that the Defendant grabbed her arms and started pushing her and told her to "go get his phone." The victim further testified that the Defendant grabbed the upper part of her arms with both of his hands and applied pressure while he lifted her up from her seated position on the couch, causing her pain.

The victim recalled that the Defendant repeatedly told her to go find his phone while he had a grip on her arms. When she refused, he "jerked [her] and [she] fell between the couch and the table." The victim testified that she hit her "bottom and [her] back" against the floor and experienced pain in both of those areas. While on the ground, the victim recounted that the Defendant was still "hollering" at her and told her that she was trying to make him lose his job. The victim then told the Defendant that she was not trying to make him lose his job, she "just want[ed] to know what's going on." The victim's youngest son came into the room, but the victim told him to go back into the bedroom where he had been. Once the victim stood up from the floor, she and the Defendant continued to argue. The victim said that the Defendant eventually left for work. He retrieved his phone a few hours later that day on his lunch break.

The victim testified that she did not call the police until two days later, on Sunday August 17, 2014, explaining that she called 911 because she "wanted [the Defendant] to leave and not come back." The victim stated to the 911 operator that she told the Defendant to leave, and the Defendant "cussed her out and tried to come in the house anyways." The victim further expressed to the 911 operator that she had to work that night but did not want the Defendant to come back to her house while her two sons were there alone. The victim acknowledged that the Defendant had his own key to the house. It was during this phone call with the 911 operator that the victim first alerted the police that the Defendant had been physical with her two days prior. The victim stated that the Defendant "put his hands on [her]," on Friday and then "tried to suffocate [her] with a pillow" the next day. The victim then proceeded to give the 911 operator the Defendant's name, race, and what clothing he was last seen wearing. The victim told the operator that

2

she did not need an ambulance. The State then played a recording of the victim's 911 call and entered it into evidence.

The victim testified that two officers arrived at her house shortly after she called 911. The victim testified that she told the police officers about the Defendant jerking her to the ground on the previous Friday. She told the officers that she "didn't want [the Defendant] to get in trouble or get locked up." The victim also testified that she showed the police officers bruises on her arms and then another officer arrived at her house to take photographs of her bruises. The victim then accompanied the officers to the police station and obtained a temporary order of protection against the Defendant. The victim recalled that she later testified at General Sessions Court and was granted an order of protection against the Defendant.

On cross examination, the victim denied getting between the Defendant and the door when they argued on August 15, 2014. The victim further denied taking the Defendant's keys from him when he had to go to work. When asked whether she attempted to provoke the Defendant by hiding his phone, the victim answered in the negative and added that she was trying to find out "who it was that [the Defendant] was cheating with, and if he was cheating." The victim agreed that she could have given the Defendant his phone and told him to leave, but she hid his phone because she was "acting out of being hurt."

Troy Lowen, an officer with the Davidson County Metro Police Department, testified that he responded to the victim's 911 call. Officer Lowen testified that the victim told him that she called the police because she did not want the Defendant to come back to her house, and she believed that he would try to come back. Further, Officer Lowen stated in his report that the victim told him that the Defendant had jerked her to the floor a few days prior. Officer Lowen said that his report indicated that the victim showed him bruises on her arms that she stated came from that event. To Officer Lowen, the bruises on the victim's arms were consistent with her testimony of the prior event, which prompted his domestic violence report. According to Officer Lowen, the victim told him that she did not wish to prosecute the Defendant, but he told her that the law required the State to press charges after hearing her statements and observing her injuries. Officer Lowen testified that on August 17, 2014, Sergeant Gary Smith photographed the victim's bruises, and then Officer Lowen himself obtained an arrest warrant against the Defendant later that night.

On cross examination, Officer Lowen stated that he did not remember details from that night but relied on his report. Officer Lowen stated that it was not indicated in the report whether the victim asked for medical help that night.

Sergeant Gary Smith testified that, on the night of August 17, 2014, he was a Sergeant in the north precinct of Davidson County. He recognized his handwriting on the information card that corresponded to the photographs of the victim's bruises.

The Defendant testified that the victim did not take his phone on August 15, 2014, and that he did not assault her that day. He claimed that the confrontation involving the victim hiding his phone occurred "a week or two before [the victim] called the police." The Defendant also testified that the victim took his keys in the same week she took his phone, both incidents occurring about two weeks prior to her calling the police. The Defendant testified that the victim often took his things as a way to start a discussion with him. The Defendant further testified that during both of the instances when the victim took his things, she positioned herself between him and the door. However, in one of the aforementioned incidents, the Defendant stated that he remembered "pulling [the victim] off the couch" so that she would go find his keys.

The Defendant claimed that on August 15, 2014, and for most of that weekend, he was not at the home. He stated that he and the victim exchanged text messages the night she called the police and she told him that there was a warrant out for his arrest. The Defendant also testified that a friend called him that weekend and told him that there were police officers at the victim's home. The Defendant stated that he turned himself in to the police the next week, "like that Monday."

The Defendant testified that nothing between him and the victim occurred on Saturday, August 16. When asked how he believed the victim got the bruises on her arms, the Defendant stated that the bruises must have come from the week she hid his keys and phone, which he maintained was many days before the police were called. The Defendant stated that the "only way she could have gotten [the bruises] is when I was pulling her off of the door." The Defendant further stated that he "had [his] hand on the knob, and [he] was grabbing her arm, and [he] was just trying to get out the door." When asked whether the Defendant had seen bruises on the victim before, he responded with "yeah . . . she's anemic." The Defendant then testified that, although he had seen bruises on the victim before, he had "never touched her."

The Defendant then testified that he had been with the victim on that Sunday, August 17, 2014. He said that the two of them went shopping on that day. The Defendant then stated that he was "gone the whole day" and, when he found out the victim called the police, he "was over at [his] homeboy house and had to stay gone." The Defendant stated that the victim had told him she wanted him to leave and not come back "plenty of times."

On cross-examination, the Defendant admitted he had trouble recollecting the events of the weekend. He then stated that he was with his daughter and not with the victim on the Sunday that she called the police. He further testified that he and the victim

4

did not get into an argument the weekend of August 15 because he had been out of the home a lot on Friday and Saturday because he was still celebrating his July 29 birthday. The Defendant denied that his recollection of that weekend was superior at the preliminary hearing to his recollection presently and stated that he was "just scared" at the preliminary hearing.

The Defendant testified that he likely got home from work at 2:00 or 3:00 a.m. on Friday August 15, 2014, and picked the victim up from her work the same day. The Defendant testified that he remembered having an argument with the victim about his phone. He further testified that the victim hid his phone in the bedroom and then closed the door. The Defendant then stated that he was angry about not having his phone but not angry "like that." When the Defendant was asked whether he grabbed the victim by her arms, he stated that he "remember[ed] pulling her off the couch." He then added that he also remembered "pulling her off the door," but contended that he never "shook her how [the prosecution] said." The Defendant further added that he grabbed her by her arms but that she "got up [from the couch] on her own."

On rebuttal, the State recalled the victim who testified that there was no discussion or argument about keys between her and the Defendant and that their only argument was about her hiding his phone. She further testified that she was anemic and that she had told the Defendant that in a conversation they had on April 4, 2015. The victim stated that the Defendant called her because of an impending court date with regard to this case, and he wanted to know if the victim would help him. The victim also testified that the Defendant had tables that belonged to her step-father and an identification card that belonged to her biological father that held sentimental importance to the victim because both of the men were deceased. The victim stated that the Defendant told her he would return these cherished belongings to her if she would not testify against him in this trial.

On recross examination, the victim testified that while she was talking with the Defendant on the phone, she told him she was anemic. The victim further testified that her anemia caused her skin to bruise easily.

The trial court admitted into evidence a recording of the victim's 911 call and a recording of the testimony given by the victim and Defendant at the preliminary hearing. After considering the testimony and evidence presented, the trial court held that the victim's testimony was more credible and found the Defendant guilty of domestic assault. At the sentencing hearing, the trial court sentenced the Defendant to serve eleven months and twenty-nine days of supervised probation. It is from this judgment that the Defendant appeals.

## II. Analysis

5

On appeal, the Defendant argues that the evidence is insufficient to sustain his conviction of domestic assault. The State responds that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt by the evidence provided. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Assault occurs when a defendant intentionally, knowingly, or recklessly causes bodily injury to another person; intentionally or knowingly causes another person reasonably to fear imminent bodily injury; or intentionally or knowingly causes physical contact with another person and a reasonable person would regard the contact to be extremely offensive or provocative. T.C.A. § 39-13-101(a)(1)-(3). Assault committed when the defendant and the victim live together is domestic assault. T.C.A. § 39-13-111(a) (2010). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(2).

The evidence, viewed in the light most favorable to the State, shows that on the morning of August 15, 2014, the Defendant and the victim, who were dating and living together at the time, engaged in an argument. The argument led to the victim hiding the Defendant's phone in another room. The Defendant then requested that the victim return his phone to him and became angry when she did not comply. The Defendant grabbed the victim's arms and pushed her to retrieve his phone. The Defendant grabbed the victim with both of his hands, lifted her off of the couch where she had been sitting, and jerked her to the floor. The victim experienced pain and suffered bruising on her arms from the incident. The Defendant then left the home and returned on his lunch break to collect his phone. Two days later, the victim called 911 because she had told the Defendant to leave her home and not come back, and she suspected he would still return. During the call, the victim told the 911 operator that the Defendant had physically assaulted her two days before. When the police officers arrived at the victim's home, she told the officers how the Defendant had been physically abusive to her and showed them the bruises on her arms. The police officers believed that the victim's testimony was consistent with her injuries.

The trial court, by its verdict, accredited the victim's testimony that she suffered injuries caused by the Defendant. Issues of witness credibility are classic questions for the trier of fact and this Court does not second-guess the weight, value, or credibility

afforded to the evidence by the trier of fact. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005).

Based upon the evidence, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that the Defendant committed domestic assault. Thus, the Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and applicable law, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE